THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES T. BLACK, Defendant-Appellant.

Fourth District   No. 4—99—0045

Opinion filed June 27, 2000.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE COOK delivered the opinion of the court:

A jury convicted defendant James Black on March 21, 1996, of four counts of aggravated stalking. The trial court sentenced him to

four concurrent eight-year terms in prison. On direct appeal, this court affirmed. *People v. Black*, No. 4—96—0419 (1997) (unpublished order under Supreme Court Rule 23). The case comes to us upon denial of Black's petition for postconviction relief (725 ILCS 5/122—1 (West 1998)), wherein Black alleges the ineffectiveness of both his trial counsel and his counsel on direct appeal.

Black's trial garnered a considerable amount of publicity in the McLean County area. On March 21, 1996, a jury was empaneled and opening arguments were heard. On the morning of March 22, an article regarding the trial appeared on page A2 of a Bloomington-Normal newspaper, The Pantagraph. The article contained several items that Black alleges would have prejudiced any juror who read them. For instance, the article stated that Black was being held without bond, "a measure usually restricted to murder suspects." The article also alleged that Black's trial counsel, Mark Messman, "agree[d] with most of the information outlined by [the State]." The article noted that Black and the complaining witness, Jeri Leenders, had gotten engaged despite Black's incarceration and a court order barring the two from having any contact. It was the stated opinion of the prosecutor that the two had "dodge[d]" the order. The entire article is reproduced as an appendix to this decision.

Therefore, on the same morning, before the beginning of the State's case in chief, the following conversation was had outside the presence of the jury:

"MR. MESSMAN [(Defense counsel)]: I would note for the record, at least to my recollection, the jury was not admonished not to read the paper, listen to the radio, watch TV; and media coverage was more extensive then [*sic*] what I thought it would be.

THE COURT: Me too.

MR. MESSMAN: Maybe the court would want to explore with the jurors if they saw that.

THE COURT: Why would I want to do that. I might get the wrong answers. I will admonish them.

MR. MESSMAN: Okay. All right. (The jury was brought in.)

THE COURT: *** [T]he media coverage in this case has been more than what I anticipated or I would have warned you about it and I suspect that some of you seen [*sic*] or read things about the case and [I] want to reemphasize your verdicts must be based solely on the evidence presented in open court and not on anything from any other sources. Those sources are not subject to the same strict standard that we are in terms of admissibility and reliability and so on. I am going to ask you throughout course of this trial to avoid listening to radio accounts or television accounts or anything about this case. I can't help it if you already have, if you had I would ask

you to put that aside and base your decision, as a juror, solely on the evidence presented in court."

Following his convictions, Black apparently retained different counsel to pursue a direct appeal. Black's appellate counsel raised neither the trial court's refusal to poll the jury nor Messman's incompetence as part of that appeal. Black then retained further counsel to represent him at his postconviction hearing, where he alleged the incompetence of both prior attorneys for failing to raise or follow through with the issue. At the postconviction hearing, the trial court stated that the article "is not as prejudicial as I thought at the time. There are some things in there that are mildly prejudicial." Black is represented by the office of the State Appellate Defender (OSAD) before this court.

■ We first consider whether some aspects of Black's claims are forfeited (sometimes referred to as "waived"). Where an alleged forfeiture stems from ineffectiveness of appellate counsel, the weight of authority holds that the strict application of the doctrine will be relaxed (*People v. Stencil*, 306 Ill. App. 3d 273, 276, 713 N.E.2d 1228, 1230 (1999)), although some courts have noted in passing the ease with which forfeiture may then be avoided (see *People v. Turner*, 187 Ill. 2d 406, 412-13, 719 N.E.2d 725, 729 (1999)), thereby leading in extreme cases to "ineffective-assistance claims *** resembl[ing] an intricate puzzle of boxes, each but the largest nested one within the others" (*People v. Stewart*, 141 Ill. 2d 107, 113, 565 N.E.2d 968, 971 (1990)). Black's case is fairly straightforward, however. He claims that his appellate counsel should have raised the publicity issue. Because he could not have raised appellate counsel's effectiveness at any time prior to the instant proceeding (which is technically not an appeal, but a collateral attack on the judgment (*People v. Whitehead*, 169 Ill. 2d 355, 370, 662 N.E.2d 1304, 1311 (1996))), we address the merits.

■ Ineffective assistance claims are decided under the familiar standard of *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). A defendant such as Black, who maintains that appellate counsel rendered ineffective assistance by failing to raise a particular issue, must show that the failure to raise the issue was objectively unreasonable and that, but for this failure, his sentence or conviction would have been reversed. *Stewart*, 141 Ill. 2d at 119, 565 N.E.2d at 973. We do not find Black's appellate counsel to have been ineffective.

■ Not every newspaper article published requires the court to poll a jury. The argument could be made that no harm lies in polling the jury and that whenever the article is prejudicial to some degree the jury must be polled. "It strikes us that inquiry of the jury is at

least a condition essential to the exercise of a sound discretion and that due process ought not hang in balance on the conjecture that no harm was done." *People v. Cox*, 74 Ill. App. 2d 342, 347, 220 N.E.2d 7, 10 (1966); *People v. Crowder*, 99 Ill. App. 3d 500, 510, 425 N.E.2d 994, 1001 (1981) (issue is whether trial court abused its discretion in what we assume was its finding that the article was not inflammatory). However, later cases have recognized the existence of countervailing concerns. For example, the harm stemming from the very act of polling the jury may outweigh any potential for prejudice in the article itself. *People v. Barrow*, 133 Ill. 2d 226, 264, 549 N.E.2d 240, 257 (1989) ("any attempt to have questioned the jurors to ascertain whether they had read the article would have disclosed the fact there was an article to the entire jury"). *Cox* itself indicated that the rule was not an absolute one:

> "This does not imply that every newspaper article published during trial requires an interrogation of the jury. Its nature, content and prejudicial effect, if any, is to be resolved by the trial court in an exercise of sound discretion." *Cox*, 74 Ill. App. 2d at 347, 220 N.E.2d at 10.

An article that is somewhat prejudicial may not deny the defendant a fair trial, even if the jury is not polled. *Barrow*, 133 Ill. 2d at 264, 549 N.E.2d at 257; *cf. People v. Sundaresh*, 153 Ill. App. 3d 930, 938, 506 N.E.2d 672, 677 (1987) ("The analysis required by *Crowder* requires a determination of whether the article at issue (not the error) was prejudicial"). We conclude no absolute rule holds that an article which is somewhat prejudicial requires that the jury be polled; rather, the trial court must exercise its discretion in determining whether polling is required or whether some other solution is possible.

■ We do not find the article at issue here to be so prejudicial as to have required the court to poll the jury. While the article reports upon the views of the various attorneys in the case, the jury was presented directly with these views during argument. And while a juror may have learned from the article that Black had been held without bond, during trial the jury was presented with the State's evidence regarding Black's propensities toward violence. (We note that Black was acquitted of the two stalking counts involving physical harm.) Finally, the prejudicial effect of the fact that Black and Leenders had become engaged, despite the reference to the court orders, is speculative at best. Consequently, the trial court properly exercised its discretion in deciding to admonish but not poll the jury.

Last, we note in passing that while Black's trial counsel sufficiently preserved the issue for review, and the trial court indicated familiarity with the article, the better practice would have been to have

introduced the article in question when the motion to poll the jury was made. This allows the trial court to timely exercise its discretion upon a fully informed basis. See, *e.g.*, *People v. Flores*, 128 Ill. 2d 66, 100, 538 N.E.2d 481, 495 (1989); *People v. Hamilton*, 100 Ill. App. 3d 942, 956, 427 N.E.2d 388, 399 (1981); *People v. Cordova*, 83 Ill. App. 3d 147, 148-49, 403 N.E.2d 788, 789 (1980).

In sum, we do not find upon review that, had a juror been exposed to this article, its contents were such that Black would have been denied a fair trial. Because the trial court was therefore not required to poll the jury regarding such exposure, Black's appellate counsel was not ineffective for failing to raise this issue on direct appeal.

Affirmed.

STEIGMANN and GARMAN, JJ., concur.

## APPENDIX

Newspaper Article
**Engagement Won't Stop Stalking Trial**
Couple reconciled after alleged threats
By Steve Arney
Pantagraph Staff

The alleged stalker is jailed without bond and is on trial. His alleged victim is sitting behind him in the courtroom with his family members and has become engaged to him.

Reconciliation after the charges are filed is a familiar theme in domestic cases, according to Greg Sams, the McLean County assistant state's attorney prosecuting James Black.

"The fact they reconciled and plan on getting married does not negate the offense," Sams said during a break in Thursday's jury selection. Prosecution is proceeding.

But defense attorney Mark Messman said the case has been "blown out of proportion" in the media and in criminal charges. "He never hurt this girl—not once."

His client, a 34-year-old Streator resident, faces six counts of aggravated stalking alleging he harassed, followed and threatened Jeri Leenders of Bloomington in incidents from February 1995 to Jan. 20.

In opening statements Thursday afternoon, Messman conceded Black may have violated laws, such as violating a court order of protection. "It certainly does not rise to the level of stalking, let alone aggravated stalking," he told jurors.

Sams said the evidence will show "this is a case about a man obsessed."

He outlined incidents in a hot-and-cold relationship in which he said Black tailed Leenders as she drove, confronted her in uninvited discussions and restrained her to prevent her from leaving conversations.

On Dec. 1, Sams said, Black restrained her in her apartment, intentionally stabbed himself with a kitchen knife and bruising her cheek while struggling with her. Defying a court protection order, he confronted her Jan. 1 and told her "you might as well move out of the state so I don't have to kill you," Sams said. On Jan. 20, according to Sams, he pulled the phone cord out of her apartment wall to keep her from calling police.

Messman said he agrees with most of the information outlined by Sams but that the charges are unwarranted.

The case has received considerable media attention, primarily because Sams successfully convinced a judge in late January to keep Black jailed without bond—a measure usually restricted to murder suspects.

As part of the court order, they were to have no contact.

Leenders is barred from jail visits and blocks were placed on her phone number to prevent Black from calling from the jail.

It leaves a question on how the two became engaged since then. Messman declined comment. Sams said he believes the two managed to dodge the order and have telephone conversations.

Leenders is expected to testify this morning. The trial is to conclude today or Monday.